Appeal No. 2010-1409 Powell v. HOME DEPOT. Mr. Cirilla, good morning and welcome. May it please the Court? There are many issues in this appeal, and non-infringement is the most important. Indeed, it's a decisive issue on liability. I'd like to start with a limitation in all the claims, dust collection structure. That limitation was added by the examiner after the claims were filed, and the claims originally called for a dust collection system to be in fluid communication with the interior of the cutting box. But for some reason, the examiner didn't like that, and he changed that to dust collection structure. Now, we don't know why he changed that, but we do know that the previous term, dust collection system, was referred to in the specification of the patent, and the patent says that those systems are well known, but they will not be further described. So they were not illustrated in the drawings. So when the examiner put in dust collection structure, there was a dust collection structure illustrated in the drawings. And that's a tray 164, which is disposed below the cutting box. Now, that limitation, properly construed, I submit, requires a reversal without remand on the infringement issue for the following reasons, which I submit apply whether or not the clause is construed as a means clause. I'll just put that aside for the time being. The court's construction... Putting aside the means plus function, are you? Excuse me? You're putting aside the means plus function, are you? No, I'll get to that later, but I'm talking about the dust collection structure as a limitation now, not as a means plus function. Okay, but doesn't the specification make clear that the same structure can be the cutting box and the dust collection structure? I'm sorry, Your Honor, I didn't understand the question. Doesn't the specification make clear that the cutting box and the dust collection structure can be the same thing? Column 5. Yes, well... In line 35. Yes, it says that the dust collection box does collect dust, but also in column 5, line 51, it talks about a separate dust collecting tray, 164, disposed beneath the work surface, 102. But that's additional structure. Excuse me? That's additional structure, is it not? But the claim term as amended by the examiner said that the dust collection structure is in fluid communication with the cutting box. Those are two separate limitations. If you're saying that, well, the dust collection structure is the cutting box, then you're saying it's okay to say dust collection structure is in communication with itself. And likewise, what Powell was forced to do because they didn't have a separate dust collection structure in the accused device. The accused device only had the cutting box. So what the examiner's amendment forced Powell to do was to claim that the back half of the cutting box is now no longer a cutting box. That's the separately claimed dust collection structure. And the rib fence, which is part of the work surface, not disclosed as part of the cutting box, but now they claim that the rib fence is the rear wall of the cutting box. And all to the rear of the rib fence to the claim rear wall of the cutting box is no longer the cutting box, it's the dust collection structure. And we submit that that clearly is against and violates this court's decision last year in Becton Dickinson. You can't conflate two claim terms. The claim specifically called for the cutting box to have a rear wall and for the work surface to have a rib fence. To say that the rib fence is the rear wall of the cutting box would then violate, not only violate the claim terms, but it would violate the specification. And that's... The problem I'm having with your argument is that while I understand that in some cases and certain circumstances, as in that Becton Dickinson case, you may have structure that separate structures perform separate functions and cannot perform the same functions. That case doesn't preclude a circumstance where the same structure performs multiple functions. And in this case you have a structure that serves both as a cutting box and as a dust collector. But to say that you can call the back half of the cutting box no longer the cutting box, and to call the rear wall of the cutting box no longer the rear wall of the cutting box, but the rear wall now is a rib fence, I submit that that violates this court's in-bank decision in Phillips. Well, that's an effort on your part to say that the structure has to be separate. But as Judge Lynn was pointing out to you and as I was pointing out to you earlier, the specification seems to contemplate that the same structure can do both. But the claim language calls for a dust collection structure to be in fluid communication with the cutting box. So you're really looking at two separate structures. Well, then your argument is that fluid communication necessarily implies separate structure. I'm not sure that's true. Well, I submit also that the fact that the rear wall of the cutting box is claimed, and if you look at the specification, the specification describes the rear wall and its claim. The specification also describes the rib fence as part of the work surface, not as part of the cutting box. And what the Examiner's Amendment forced Powell to do was to say that the rib fence, which is in between the front and the rear of the cutting box, is now the rear wall of the cutting box, which violates the specification. It goes against the Phillips case. And I submit it's improper and is something which I think, I don't enjoy bringing this point up, but I think what happened here was this argument which Powell made is so untenable that what they did was they argued that our expert witness agreed that the rib fence was the rear wall of the cutting box. And I submit our expert witness made no such agreement. They argued where? When you say they argued about what your expert said, in what venue did they argue that? Are you talking about here in the briefs or before the jury? No, before the jury. That was argued before the jury. So I assume you got up and corrected them if you think that's not true. Excuse me? So I assume you had the opportunity to correct them if you thought that was inaccurate. Well, they argued it on this appeal and we're submitting that that's a misstatement, a misrepresentation of the expert's testimony. What about some of the other issues here? Do you agree that under Theracent's that the inequitable conduct claim fails? For the inequitable conduct issue, that's an issue that's subject to review by this court. What's the answer to my question? I'm sorry, Your Honor. Do you agree that under Theracent's the inequitable conduct claim here fails? No, I don't, Your Honor. Why not? What we have here, we have in the inequitable conduct claim a case where the applicant Powell made a misrepresentation. I understand what the facts are. Why doesn't Theracent's govern here? Well, Theracent's relates to but for issues with respect to patentability. That was not the issue here in the petition that was filed by Powell. He was saying that he had an obligation to make a product and that obligation entitled him to have his application taken up special. And after it was filed for a few months, he found out that Home Depot was purchasing the same product from somebody else. Yet he let that declaration stay in the patent office with that misstatement. Is that an omission? That's an omission, failure of his? He failed to correct the statement. It's something which he knew was in the record and he asked the patent office, when are you going to take up my petition to make special? At that point, they knew that the statement in the petition to make special was not accurate, was not true. So it's an omission. He failed to correct something. He let it stand. He let it stand and the district court said that petition did not relate to patentability so it's of low materiality. Furthermore, the applicant could have submitted another petition alleging infringement. Therefore, we're not going to hold an equitable conduct. Well, on both of those points, this court in general electrode said that the petition doesn't have to relate to patentability to be material. If it's an outright deception for this court to say it's okay, what you're doing is you're saying it's okay to the patent bar to lie to the patent office if you have another way of getting the case made special. And even as to the other way of getting the case made special, that's not an easy task. They have to establish clearly that there was infringement. And the district court on two separate occasions, one they found no literal infringement and the other they found no likelihood of prevailing on the merits. That was in a preliminary injunction decision and a summary judgment motion. So my argument here is that under the general electoral case, which is cited in our brief, that this court should reverse and hold the patent unenforceable. Otherwise, you're saying to the patent bar, it's okay to... Before you... Can I just cut you off now because I'd like to move on to willfulness before... your arguments with respect to willfulness before your time runs out. Okay. Is it your position that the objective inquiry under Seagate is one that should not go to a jury? I'm a little unclear on what your argument is with regard to willfulness. The objective reasonableness, I think here what we had, we had summary judgment decision and preliminary injunction motion decision, which did not go to the jury. I think there could be situations where under Seagate, because the evidence is of such a nature as in this case, the court did not submit it to the jury, that should be taken up by the court. And the court should determine because it found no literal infringement, a summary judgment motion, and because it denied preliminary... So you're not suggesting the question shouldn't go before the jury. You're suggesting that after the fact, the judge under Jamal should take those factors into consideration in the Jamal inquiry. Is that your position? In this case, yes. Okay. In other words, there's certain issues that aren't appropriately presented to the jury, such as claim construction, such as inequitable conduct, and with respect to those issues, the objective inquiry has to be undertaken by the judge rather than jury. Yes, that's my position as to the objective recklessness aspect of willful infringement. The subjective intent can be taken up by the jury. That's the second prompt, but you don't get to that if there's no objective... So your answer to Judge Breaux's question is not that these issues would go to the jury and then be addressed by the judge in a Jamal, but that they should be addressed by the judge because they're questions of law. Yes, yes, Your Honor. All right. Would you like to reserve the balance of your rebuttal time? Yes, please. All right. Thank you. We'll hear from Mr. Dunn. May it please the Court, and good morning. I'd like to deal first with the dust collection structure. Wait, wait, wait. Let's just finish up on this, the willful infringement. How can it be that issues of claim construction and inequitable conduct, which are reserved for the court, would have to go to the jury? I mean, how can it be that the jury, in connection with the willfulness determination, the objective aspect of the willfulness determination... Your Honor, willfulness is a jury question, and the question is, is there substantial evidence... No, no, wait. How can it be a jury question? Let's take claim construction. I mean, certainly you're not suggesting that the whole claim construction dispute be replayed before the jury in order for them to make the willfulness determination. Well, the claim construction is in the jury instructions, so... They're told what the claim construction is. How are they supposed to decide whether there's an objectively reasonable claim construction or not when they're not supposed to hear conflicting evidence about the claim construction? Your Honor, let me comment, make a comment. You may be right. It may be that the judge has to look at it afterwards. So let me deal with the merits of it. The merits of it is that the judge made two mistakes. He admitted he made two mistakes in claim construction. One of them, by any standard, was an egregious mistake. He misunderstood Section 112, Paragraph 6. He got it reversed, whether you had to have structure or whether you didn't have to have the structure. Why don't you address, then, the claim construction issues here, which will bear on both whether the ultimate claim constructions were correct or whether there was a reasonable dispute as to them. You mean like the... The dust collection and the tabletop. Fine, I will. I'm more concerned about the tabletop issue than the dust collection. Then let me deal with the tabletop issue. The tabletop issue is that the judge originally said, came to one conclusion and agreed later he made a mistake. His construction is horizontal surface on which an intended function can be performed and may contain openings of various shapes and sizes. Now, Home Depot's response to that is that the function of the tabletop is to support the workpiece. The function of the tabletop is not to support the workpiece. It's to support the top of the work surface. If you look at the dictionary, for example, tabletop is defined as something flat. And, you know, these mounting boards don't create a flat surface. I mean, it may be that there are holes in the table for wires and things like that. But doesn't the tabletop have to be a flat surface? Your Honor, if it's a flat surface, it can have openings. This invention requires openings because there are two pull bars by which you move the workpiece toward and away from the rip fence. So you can have a tabletop with big holes in it to accommodate those pull bars. You can also have a tabletop, for example, constructed, if I had a tabletop constructed of six 2x4s, which across the top is a flat surface, but which has big holes in it to accommodate these pull bars, that would be a tabletop. Maybe so, but the accused device here is just two widely separated mounting boards as it's shown in the briefs. And the question is, is that a tabletop? I must admit it is a tabletop. It is at the top of the table. It performs the function recited in the claims of supporting the work surface. It is a flat surface. It would be the same as if you had a big piece of ply board and you cut big holes in it to accommodate pull bars. And it's flat, it supports a work surface, and you can call it a tabletop. And there's nothing wrong, I submit, and our expert witness said this, that you can have that tabletop formed of boards, of 2x4s, in a pile. If you look across, if you bent down and you look at the top of the table, you will have a plane. It is a flat surface and it is capable of supporting a work surface. Now, your question would be equally appropriate if I had five piles of 2x4s and with spaces maybe an inch or even a foot between piles. Or if I had ten piles, your question would be the same. And I submit, the question is not whether you have boards, 2x4s, forming the tabletop. It functions as a tabletop. The function is to support the work surface. It does exactly that. It also accommodates the push bars. And I submit that the district court got it right. And the district court not only got it right, but he thought the position of Home Depot, he used the word ludicrous. He said it's ludicrous to suggest that you can't have a surface formed by whatever means with openings in it, which functions as a tabletop would function. And that's exactly the case here. So I suggest that it ignores what I suggest is the purpose of this tabletop to suggest that because it's formed of boards rather than a flat surface, that somehow, someway the situation has changed. Now, as to dust collection structure, I would suggest that the answer is a very easy one. Mr. Cirillo says something can't communicate with itself. But the fact is that the definition that the court gave of dust collection structure was two components, a place to temporarily store dust or chips and at least one port to allow the vacuum extraction. The spec itself calls it a dust collection cutting box. It is clear that the rear of this box, whatever you want to call it, collects dust. That's very clear. It's clear from pictures. It's clear from testimony. There are two elements, port plus an area where dust can collect. That is not the same thing as the front end of the cutting box, which is where the cutting takes place. So the interior is communicating with something other than itself because it's A communicating with A slash B. And I suggest that that alone undercuts Home Depot's argument, wholly aside from the fact that the case law of this court makes absolutely clear that a single component can perform two functions. There are many cases, one of which is intellectual property development versus UA Columbia Cablevision, which basically says, it's a 2003 Federal Circuit case, that a single structure can perform two functions. In this case, the rip fence can provide the function of a rear wall of the front end, and it also can provide the function of a stop against which you move the work piece. Mr. Can I turn your attention, did I just conclude that in clarity, to the inequitable conduct? Yes. Is it your view that under Therosense, this petition to make special can never meet an inequitable conduct test because it's not related to patentability in any event? Yes, and let me explain why. First of all, there are two ways under Therosense to find inequitable conduct. One is but for materiality relating to patentability, and that clearly is not the case. So it can't qualify under that. There's a second element of Therosense, affirmative egregious misconduct. I would guess that if somebody deliberately lied in connection with a petition to make special, like under General Electro Music, which they cite, I would guess that that might possibly survive under Therosense. But there are all kinds of other reasons why under Therosense this inequitable conduct can't survive. One is the old rule pre-Therosense was that you got to have the single most likely inference to be drawn from materiality to support intent. Well, let's assume we had intent. Let's assume hypothetically that there was intent, that this guy said, well, the petition to make whole was true at the time. I know it isn't true any longer, but who cares? I still want to get the benefit of that. I'm not going to go back and correct the record before the PTO. Let's assume that this guy knowingly and intentionally wanted to trick the PTO and therefore didn't go in and correct his petition to make special. Would that be sufficient in your view? There are two aspects to my answer. One is the only way it could be is affirmative egregious misconduct. So there you have affirmative misconduct. I forget, I should know, but I forget whether Therosense said that an omission doesn't qualify under any circumstances. That's the question. Pardon? That's the question. Yes, I forget whether Therosense says that. I should know. I sat in the courtroom. I listened to everything. I read it five times. Inequitable conduct is one of the more interesting subjects. I think it said it can't be an omission. But even if it can be an omission, the facts of this case, there is no reasonable way any jury could have, or any judge, could have found affirmative inequitable conduct here, particularly since the judge said that he found that Michael Powell reasonably believed he was obligated to Home Depot when the contract discussions were finalized. So his own finding... No, that's the initial representation. That's not a finding that relates to the failure to correct it. No, I think that is not. And I'll just give you, it's 814 paragraph 40. I don't have it in front of me. I think he was talking about the final one, I believe. The initial one was with someone else, wasn't it? No, the initial one was true. The judge agreed the initial one was true. At the time, he felt obligated. But Michael Powell testified that he felt obligated even after that because he was convinced that they would finally enter into an agreement. And I believe 814 paragraph 40 deals with the latter, not with the former. Can I finish your sentence? No, I finished. I wanted to move on to one other subject, which is the reasonable loyalty. Let's suppose that we conclude that the 8450 figure isn't supportive. Okay. Then isn't the profit figure, the 2180 figure, a ceiling on what you can get for a reasonable loyalty? Your Honor, the 2180 figure was a lost profits number. Yeah, I understand that. And Home Depot agreed. It insisted that lost profits should not be in the case. Well, okay. Let's put that aside. I've read the record, and so let's assume it is in the case, okay? Isn't the 20—assuming that the issue's in the case, assuming that the 8450 isn't—or 8540 isn't supported, doesn't the profit, the lost profit, put a ceiling on the reasonable loyalty? I don't believe so, Your Honor. There are other numbers. There are other numbers beyond the 2150. Well, how could it be that in the negotiation someone would pay—would insist on receiving more than the lost profits? How would that be a reasonable loyalty negotiation? Your Honor, because the case law of this Court says that—the Golight case— that a reasonable royalty can be greater than lost profits. And this is a very unusual case. This is a case where profits were not the consideration. This was a case where employees of Home Depot were getting lacerated, were losing fingers. They had enormous problems with the safety of their employees. They were very concerned with their competition with Lowe's and—I forget the other group— who were cutting dimensional lumber. And eliminating the saws was not even a possibility, given all of the evidence in this case. So the question was, what were they willing to pay? They paid $600,000 to remove their Amga saws because they were not compatible with the Industrial Plex saw guards. And if they're willing—and that's where the higher number, 8450, comes from. If they're willing to pay almost $9,000 to replace saws so that they could use Michael Powell's saw guards, which is what the Industrial Plex saw guards were, then that shows you that is a reasonable upper limit. And we're talking here— But the payment was not just for the guard. It was for the entire saw. Your Honor, the claims in this case cover the entire combination. Claim 1, in combination with the radial arm saw assembly, comprising—and so on and so forth. Claim 1 covers it. Claim 2, Claim 3 cover the combination. And therefore, it is reasonable to talk about the combination. But wholly aside from that, their own witnesses said, this is not about money. This is about safety. Suppose we find that the 8450 figure is not supported by the record. What should we do? The Honor, I don't think—at the very least, I don't think you should pick another number. I think the question here is—you would have to remand it, I would assume. For a new trial. Perhaps for a new trial. But I'm suggesting— Or a possible remand. If you can—yeah, if you can pick a number. But 2150 is not the only number. There were other numbers. There is a number—if I can find it. I'm not suggesting this is true. 3359 per unit, which they say they could have bought from Volstar. We say that is not a feasible option because by the time of the date of infringement, May 2006, Home Depot had over a thousand of these units installed. You would have had to remove those units at great cost. There would be a lull period when they wouldn't be protected, when the employees wouldn't be protected, when there wouldn't be sales. So there are all kinds of problems with picking any one of those numbers. And you can't pick the 2150 number or whatever—I'm sorry. Just go ahead. You can't pick the little above 2000 number because it's a lost profits number. And Home Depot insisted they didn't want this to be a lost profits case. The question is, what could a reasonable jury have found under these circumstances? And it could have found that the total, the 8450, given the circumstances, since this was not a lost profits case, their own witness said, what do I tell my customers? We've been giving you dimensional lumber cut. Do I tell them suddenly I'm not going to give them anymore? He said that wasn't even an option. Your argument is based on a reasonable royalty, but what confuses me is that at some points in the record there's a discussion about royalties relating to sales, relating to units, manufacturing, sale. There are other points in the record that seem to suggest that the royalty is based on use that is testimony about, well, over the lifetime of the patent of 20 years, 18 years or so, it's roughly $300 per patent, per store, per year. So about a dollar a day, something like that, per store per day. Was this case presented and did the jury have evidence before it that would support a reasonable royalty based on use rather than manufacture and sale? Your Honor, the entire case against Home Depot was based on use. The case against Industrioplex was based on manufacture and or sale, and we settled out for $500,000 against them. That was a different case. The case against Home Depot, the record reeks with evidence that it's based on its use because they were not selling it. They were using it. They were using it to protect their employees so that they could continue to cut dimensional lumber, could continue to compete with Lowe's and other people they were competing with, and most of all, protect their employees. Not only were they incurring great expenses in harm to their employees and in steps to protect their employees, but they were concerned about the health of their employees. So it was, they would have been willing, I submit, that if they were willing to pay $8,450 to be able to use the Industrioplex saws, which are really Michael Powell saws, we submit. Their own video shows that they were using our saw to illustrate it. If they were willing to pay that, a reasonable jury could have found that that was the upper limit. Now, our expert didn't pick that as his argument. But it's an upper limit based on an assumed purchase of the item with a license to purchase it, not a license, not a continuous license to use it, right? No, I disagree, Your Honor. It was an expense they incurred to be able to use these Industrioplex saws. And if they were willing to pay that to use these saws, a reasonable jury could have found that that was the upper limit. Our expert didn't pick that upper limit. Our expert said a reasonable royalty was $6,500, $7,000, $7,500. The jury came in almost exactly at the $7,500. It was a little above it, a couple hundred dollars above it. I submit that a reasonable jury, which is what this issue was about, could have reached that conclusion because this was not about profits. This was about morality. This was about their willingness to continue to do this when their employees were being hurt. They were not willing to do that from the CEO down. I thank you. I think we have your position. Let's hear from Mr. Cirilla and rebuttal. Thank you for the extra time. Okay. You're welcome. We'll restore Mr. Cirilla five minutes for rebuttal. I'd like to make some brief comments with respect to the issue about whether a single structure can perform two functions or not. What we have here is, Powell is not asserting that the dust collection box provides, I'm sorry, the dust cutting box, dust collection cutting box performs two functions. What they're saying is you have to disregard the specification which says the cutting box extends to the rear of the rip fence, to the rear wall, and treat that no longer as a cutting box, but as the claimed dust collection structure. That's my principal argument. And to do that, to try to beef that up, they have misrepresented our expert's testimony because he was asked whether or not the cutting box begins at that place where the saw blade meets the work piece, that's at the rip fence. He says, I do not start, I do not read starts or at which it begins in that construction. The cutting box contains that point in which the saw blade meets the work piece. And that point can be anywhere within that structure, that box according to that construction. So the cutting box has to be the cutting box disclosed in the application, in the specification. Phillips requires that. Mr. Cerullo, what's your comment with respect to the tabletop limitation? Yes, my comment there is if you, I don't agree at all with what Mr. Dunner said because if you look at the claims, the claims start out by talking about a radial arm saw assembly comprising a table having a top. So that's the tabletop we're talking about. The pre-existing radial arm saw assembly which has a tabletop. It doesn't say that the top has to be continuous or unbroken though, does it? No, but the tabletop in the radial arm saw assembly has a function. Namely, the function is to hold the work piece as it's being cut. In fact, that's shown in the figure. But isn't that the function of the top boards in the accused structure to support the work piece? No. It's not? No. How is the work piece supported? The function of the boards in the Home Depot device is to support the work surface on which the wood to be cut is placed. So what I'm saying is when you, when you get to the claim term that says a planar top work surface mounted on the tabletop, what is the tabletop? The tabletop has to be what is previously described in the claim as the tabletop in the radial arm saw assembly. And that's exactly what the examiner said when he made his amendment. He said, and this is on page A14073, he says the planar top work surface mounted on the tabletop. That's right out of the claim. And he says, i.e., the tabletop of the radial arm saw. That's what the Home Depot device has removed. And that's our point. That's why there's no infringement here because the claim requires the tabletop on which the work surface is mounted. That has to be the same tabletop as in the radial arm saw assembly which supports the work surface. With respect to the reasonable royalty, Mr. Dunner argues that there was evidence presented to the jury to support a reasonable royalty based on use. Do you agree or not agree? What I disagree with is, and I heard nothing from Mr. Dunner's argument about the statutory requirement. The statute 35 U.S.C. 284 says damage is adequate to compensate for the infringement. The Supreme Court case that we cite says you look to the injury to the patent owner. That's what determines the compensation, not the use by the alleged infringer. So what is the compensation to Powell for this injury? Ball Star was involved in the case earlier and they were not the owner of the patent. So they were eliminated. They made the devices. So Powell is the patent owner. And the statute says the damages must be adequate to compensate Powell for the infringement. And what would be adequate to compensate him for the infringement? $15 million? No way. When Ball Star was making the unit, Ball Star's profit was like $2,100. What was Golight talking about? Excuse me? What was Golight talking about when it said that lost profits isn't a ceiling on reasonable loyalty? Well, again, if you look at the injury to the patent owner, that doesn't say lost profits is the ceiling. You must look to the injury of the patent owner because there could be a loss of market share or things like that. There could be other things that may enter into it. Was there any evidence of injury to the patent holder here beyond the lost profits? Not at all. Nothing in the record. But my point, just to sum it quickly, is that the statute requires damages to compensate for the infringement. And the Supreme Court has held that you look to the injury to the patent owner. And the injury to the patent owner is not $15 million in this case. That is way off the mark. All right. That will have to be the final word. I thank you, Mr. Sorrell, Mr. Dunner. Case is submitted.